Michael R. Lozeau (State Bar No. 142893)
Richard T. Drury (State Bar No. 163559)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205 (fax)
E-mail: michael@lozeaudrury.com
          richard@lozeaudrury.com
          doug@lozeaudrury.com

Gideon Kracov (State Bar No. 179815)
LAW OFFICE OF GIDEON KRACOV
801 S. Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Tel: (213) 629-2071
Fax: (213) 623-7755
Email: gk@gideonlaw.net

Attorneys for Plaintiff
CENTER FOR COMMUNITY
ACTION AND ENVIRONMENTAL
JUSTICE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE, a non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> SIERRA ALUMINUM COMPANY, a corporation, <br><br> Defendant. | Case No. _5:14-cv-1651_____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE

("CCAEJ"), a California non-profit association, by and through its counsel, hereby

alleges:

## I.    <u>JURISDICTION AND VENUE</u>

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.    On June 11, 2014, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CCAEJ's notice letter is attached as Exhibit A, and is incorporated by reference.

3.    More than sixty days have passed since notice was served on Defendant

COMPLAINT

and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.     INTRODUCTION

5.     This complaint seeks relief for Defendant's discharges of polluted storm water and non-storm water pollutants from Defendant SIERRA ALUMINUM COMPANY's ("Sierra Aluminum" or "Defendant") aluminum extrusions manufacturing facility located at 11806 and 11880 Pacific Avenue in Fontana, California ("the Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ (hereinafter the "Permit" or "General Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

COMPLAINT

### III. **PARTIES**

6.      Plaintiff CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE ("CCAEJ") is a non-profit public benefit corporation under the laws of the State of California with its main office in Jurupa Valley, California.  CCAEJ is dedicated to working with communities to advocate for environmental justice and pollution prevention.  CCAEJ and its members are deeply concerned with protecting the environment in and around their communities, including the Santa Ana River Watershed.  To further these goals, CCAEJ actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

7.      CCAEJ has members living in the community adjacent to the Facility and the Santa Ana River Watershed.  They enjoy using the Santa Ana River for recreation and other activities.  Members of CCAEJ use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of CCAEJ use those areas to recreate and view wildlife, among other things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CCAEJ's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

COMPLAINT

8.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

9.     Defendant SIERRA ALUMINUM COMPANY is a corporation that operates an aluminum extrusions manufacturing facility in Fontana, California.

## IV.   STATUTORY BACKGROUND

10.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

11.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

12.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

COMPLAINT

5

13.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

14.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

15.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8).  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water

discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

16.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.

17.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT

COMPLAINT

(Section B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)). The SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Sections A(9), (10)).

18. Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board. *See also* Section E(6). Section A(9) of the General Permit requires an annual evaluation of storm water

controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

19.    The General Permit requires dischargers commencing industrial activities before October 1, 1992, to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

20.    As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and

analyze during the wet season for basic parameters, such as pH, total suspended solids, electrical conductance, total organic content or oil & grease, and certain industry-specific parameters.  Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Section B(5)(c)(iii) requires discharges to sample for parameters dependent on the standard industrial classification ("SIC") codes for activities at the facility.  Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."  Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample…facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm water discharges from the storm event."

21.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9), C(10) and B(14).

22.     The General Permit does not provide for any mixing zones by

COMPLAINT

dischargers.  The General Permit does not provide for any dilution credits to be applied by dischargers.

23.     The Regional Board has established water quality standards for the Santa Ana River Watershed in the "Water Quality Control Plan for the Santa Ana River Basin (Region 8)," generally referred to as the Basin Plan.

24.     The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health."

25.     The Basin Plan includes a narrative oil and grease standard which states that "[w]aste discharges shall not result in deposition of oil, grease, wax, or other material in concentrations which result in a visible film or in coating objects in the water, or which cause a nuisance or adversely affect beneficial uses."

26.     The Basin Plan provides that "waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses..."

27.     The Basin Plan provides that "t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5…"

28.     The Basin Plan contains a narrative floatables standard which states that "[w]aste discharges shall not contain floating materials, including solids, liquids, foam or scum, which cause a nuisance or adversely affect beneficial uses."

COMPLAINT

29.    The Basin Plan contains a narrative color standard which states that "[w]aste discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses. The natural color of fish, shellfish or other inland surface water resources used for human consumption shall not be impaired."

30.    The Basin Plan also sets out numeric water quality standards for Reach 3 of the Santa Ana River, and includes a Site Specific Objective ("SSO") of 0.0182 mg/L for copper.

31.    The EPA has adopted freshwater numeric water quality standards for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC") and for copper of 0.013 mg/L (CMC).  65 Fed.Reg. 31712 (May 18, 2000).

32.    The facility's storm water flows into Reach 3 of the Santa Ana River. The 2008-2010 EPA 303(d) List of Water Quality Limited Segments lists Reach 3 of the Santa Ana River as impaired for copper.  *See* http://www.waterboards.ca.gov/centralvalley/water_issues/tmdl/impaired_waters_list/2008_2010_usepa_303dlist/2082010_usepa_aprvd_303dlist.pdf.  In October 2011, EPA added additional waters to the 303(d) list, including the addition of Reach 3 of the Santa Ana River as impaired for lead.  See http://www.epa.gov/region9/water/tmdl/303d-pdf/Final-DecisLtrEnclosResponsSumCA2008-10-303d.pdf.

33.    EPA has established Parameter Benchmark Values as guidelines for

determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  EPA has established Parameter Benchmark Values for the following parameters, among others: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; total organic carbon ("TOC") – 110 mg/L; oil and grease ("O&G") – 15 mg/L; aluminum – 0.75 mg/L; copper – 0.0.0156 mg/L; and zinc – 0.13 mg/L.  The benchmark values for copper and zinc are also hardness dependent.  The values here are based on a hardness range of 100-125 mg/L $CaCO_3$, which is the default listing in the California Toxics Rule.

34.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.     STATEMENT OF FACTS

35.     Defendant Sierra Aluminum operates an aluminum extrusions manufacturing facility located at 11806 and 11880 Pacific Avenue in Fontana, California.  On information and belief, CCAEJ alleges that the Facility is engaged in the manufacture of standard and custom aluminum extrusions.  The Facility falls

COMPLAINT

13

within SIC Code 3354. The majority of the Facility is paved and used for manufacturing, processing, storing, and transporting materials related to production processes. On information and belief, Plaintiff alleges that there are at least two large buildings located on the property. Plaintiff is informed and believes, and thereupon alleges that manufacturing, processing, and storage of materials is conducted both inside and outside of these buildings.

36.     Defendant channels and collects storm water falling on the Facility through a series of storm water drains that lead to at least four storm water outfalls. The Facility's outfalls discharge to San Bernardino County's municipal storm sewer system, which discharges into the San Sevaine Creek, which flows into the Santa Ana River.

37.     On information and belief, Plaintiff alleges that the industrial activities at the site include the manufacturing of standard and custom aluminum extrusions including billet casting, extrusion, painting, anodizing, thermal improvements, and fabrication.

38.     On information and belief, Plaintiff alleges that all storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

39.     Significant activities at the site take place outside and are exposed to rainfall. These activities include the production and storage of the numerous types of

COMPLAINT

14

materials and finished products handled by the Facility.  Loading and delivery of materials occurs outside.  Trucks enter and exit the Facility directly from and to a public road.  Outdoor areas of the Facility are exposed to storm water and storm flows due to the lack of overhead coverage, berms, and other storm water controls.

40.    Industrial machinery, heavy equipment and vehicles, including trucks and forklifts, are operated at the Facility in areas exposed to storm water flows. Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, coolant, and hydraulic fluids that are exposed to storm water flows, and that such machinery and equipment track sediment and other contaminants throughout the Facility.  On information and belief, Plaintiff alleges that trucks leaving the Facility track substantial amounts of material onto adjoining public roads.  On information and belief, Plaintiff alleges that during rain events, material that has been tracked from the Facility onto public roads during dry weather is transported via storm water to storm drain channels.

41.    Plaintiff is informed and believes, and thereupon alleges that storm water flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease, and other pollutants as it flows toward the storm water drains.  Storm water and any pollutants contained in that storm water entering the drains flows directly to the Facility's outfalls which discharge to San Bernardino County's municipal storm sewer system, which flows into the San Sevaine Creek, which flows into the Santa

Ana River.

42. The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States. The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with these and other exposed sources of contaminants. The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated. The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated. The Facility lacks controls to prevent the tracking and flow of pollutants onto adjacent public roads.

43. Since at least October 14, 2009, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility. The sample results were reported in the Facility's annual reports submitted to the Regional Board. Defendant Sierra Aluminum certified each of those annual reports pursuant to Sections A and C of the General Permit.

44. Since at least October 14, 2009, the Facility has detected pH, TSS, O&G, TOC, zinc, aluminum, and copper in storm water discharged from the Facility. Levels of these pollutants detected in the Facility's storm water have been in excess of EPA's numeric parameter benchmark values. Levels of these pollutants detected

in the Facility's storm water have been in excess and outside of the parameters for water quality standards established in the Basin Plan.

45.    The following discharges of pollutants from the Facility have contained concentrations of pollutants in excess of numeric water quality standards established in the Basin Plan and the California Toxics Rule as well as narrative standards in the Basin Plan.  They have thus violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Observed Concentration / Conditions | Basin Plan Water Quality Standard / California Toxics Rule | Outfall (as identified by the Facility) |
|---|---|---|---|---|
| 2/8/2013 | pH | 6 s.u. | 6.5 – 8.5 s.u. | North 11806 |
| 2/8/2013 | pH | 6 s.u. | 6.5 – 8.5 s.u. | South 11806 |
| 12/12/2011 | pH | 8.6 s.u. | 6.5 – 8.5 s.u. | North east 11880 |
| 10/5/2011 | pH | 6.31 s.u. | 6.5 – 8.5 s.u. | North east 11880 |
| 10/5/2011 | pH | 6.32 s.u. | 6.5 – 8.5 s.u. | South east 11880 |
| 10/6/2010 | pH | 9.44 s.u. | 6.5 – 8.5 s.u. | North 11806 |
| 2/5/2010 | pH | 5.9 s.u. | 6.5 – 8.5 s.u. | South 11806 |
| 2/5/2010 | pH | 5.5 s.u. | 6.5 – 8.5 s.u. | South East 11880 |
| 2/8/2013 | Zinc | 0.91 mg/L | 0.12 mg/L (CMC) | North 11806 |
| 2/8/2013 | Zinc | 0.24 mg/L | 0.12 mg/L (CMC) | South 11806 |
| 2/8/2013 | Zinc | 0.3 mg/L | 0.12 mg/L (CMC) | North East 11880 |
| 2/8/2013 | Zinc | 0.56 mg/L | 0.12 mg/L (CMC) | South East 11880 |

| | | | | |
|---|---|---|---|---|
| 10/11/2012 | Zinc | 8.44 mg/L | 0.12 mg/L (CMC) | North 11806 |
| 10/11/2012 | Zinc | 6.23 mg/L | 0.12 mg/L (CMC) | South 11806 |
| 12/12/2011 | Zinc | 0.69 mg/L | 0.12 mg/L (CMC) | North 11806 |
| 12/12/2011 | Zinc | 0.37 mg/L | 0.12 mg/L (CMC) | South 11806 |
| 10/5/2011 | Zinc | 5.73 mg/L | 0.12 mg/L (CMC) | North 11806 |
| 10/5/2011 | Zinc | 1.23 mg/L | 0.12 mg/L (CMC) | South 11806 |
| 10/5/2011 | Zinc | 0.55 mg/L | 0.12 mg/L (CMC) | North East 11880 |
| 10/5/2011 | Zinc | 4.97 mg/L | 0.12 mg/L (CMC) | South East 11880 |
| 2/16/2011 | Zinc | 0.78 mg/L | 0.12 mg/L (CMC) | North 11806 |
| 2/16/2011 | Zinc | 0.17 mg/L | 0.12 mg/L (CMC) | South 11806 |
| 2/16/2011 | Zinc | 0.2 mg/L | 0.12 mg/L (CMC) | South East 11880 |
| 10/6/2010 | Zinc | 5.07 mg/L | 0.12 mg/L (CMC) | North 11806 |
| 10/6/2010 | Zinc | 0.69 mg/L | 0.12 mg/L (CMC) | South 11806 |
| 2/5/2010 | Zinc | 0.26 mg/L | 0.12 mg/L (CMC) | North 11806 |
| 2/5/2010 | Zinc | 0.27 mg/L | 0.12 mg/L (CMC) | South 11806 |
| 2/5/2010 | Zinc | 0.15 mg/L | 0.12 mg/L (CMC) | South East 11880 |
| 10/14/2009 | Zinc | 0.15 mg/L | 0.12 mg/L (CMC) | North 11806 |
| 10/14/2009 | Zinc | 0.54 mg/L | 0.12 mg/L (CMC) | South 11806 |
| 10/14/2009 | Zinc | 3.27 mg/L | 0.12 mg/L (CMC) | North East 11880 |
| 10/14/2009 | Zinc | 1.61 mg/L | 0.12 mg/L (CMC) | South East 11880 |
| 2/5/2009 | Zinc | 0.19 mg/L | 0.12 mg/L (CMC) | North 11806 |
| 2/5/2009 | Zinc | 0.19 mg/L | 0.12 mg/L (CMC) | South 11806 |
| 2/8/2013 | Copper | 0.02 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North 11806 |
| 2/8/2013 | Copper | 0.03 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North East 11880 |

COMPLAINT

| 2/8/2013 | Copper | 0.05 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South East 11880 |
| 10/11/2012 | Copper | 0.2 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North 11806 |
| 10/11/2012 | Copper | 0.2 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South 11806 |
| 10/11/2012 | Copper | 0.02 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South East 11880 |
| 12/12/2011 | Copper | 0.04 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North 11806 |
| 12/12/2011 | Copper | 0.03 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South 11806 |
| 10/5/2011 | Copper | 0.16 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North 11806 |
| 10/5/2011 | Copper | 0.07 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South 11806 |
| 10/5/2011 | Copper | 0.12 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North East 11880 |
| 10/5/2011 | Copper | 0.06 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South East 11880 |
| 2/16/2011 | Copper | 0.03 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North 11806 |
| 2/16/2011 | Copper | 0.04 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North East 11880 |
| 2/16/2011 | Copper | 0.03 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South East 11880 |

COMPLAINT

| 10/6/2010 | Copper | 0.32 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North 11806 |
| 10/6/2010 | Copper | 0.14 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South 11806 |
| 2/5/2010 | Copper | 0.05 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North 11806 |
| 2/5/2010 | Copper | 0.05 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South 11806 |
| 2/5/2010 | Copper | 0.02 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North East 11880 |
| 2/5/2010 | Copper | 0.03 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South East 11880 |
| 10/14/2009 | Copper | 0.03 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North 11806 |
| 10/14/2009 | Copper | 0.1 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South 11806 |
| 10/14/2009 | Copper | 0.05 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | North East 11880 |
| 10/14/2009 | Copper | 0.03 mg/L | 0.0182 mg/L (SSO) / 0.013 mg/L (CMC) | South East 11880 |
| 10/11/2012 | Narrative | Suspended materials or solids | Basin Plan at 4-16 | North 11806 |
| 11/5/2011 | Narrative | Cloudy with floating objects | Basin Plan at 4-11; Basin Plan at 4-16 | North 11806 |
| 10/6/2010 | Narrative | Floating objects | Basin Plan at 4-11 | North 11806 |
| 10/6/2010 | Narrative | Floating objects | Basin Plan at 4-11 | South 11806 |

COMPLAINT

| 10/14/2009 | Narrative | Discoloration with floating objects | Basin Plan at 4-11; Basin Plan at 4-16 | South East 11880 |
|---|---|---|---|---|

46.     The level of pH in storm water detected by the Facility has been outside the range of the benchmark value for pH of 6.0 – 9.0 units established by EPA.  The level of pH in storm water detected by the Facility has been outside the range of 6.5 – 8.5 units established by the Basin Plan.  On February 8, 2013, the level of pH measured by Sierra Aluminum at two of its outfalls was 6 s.u.  On October 6, 2010, Defendant measured a pH level of 9.44 at the "North 11806" outfall.  On February 5, 2010, Defendant measured pH levels of 5.9 s.u. and 5.5. s.u. at two of its outfalls.

47.     The level of TSS in storm water detected by the Facility has exceeded the benchmark value for TSS of 100 mg/L established by EPA.  For example, on October 11, 2012, the level of TSS measured by Defendant at the "North 11806" outfall was 838 mg/L.  That level of TSS is over 8 times the benchmark value for TSS.  Sierra Aluminum also has measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L on February 8, 2013; October 5, 2011; and October 14, 2009.

48.     The level of O&G in storm water detected by the Facility has exceeded the benchmark value for O&G of 15 mg/L established by EPA.  On October 14, 2009, Sierra Aluminum measured O&G levels of 33 mg/L and 18 mg/L at two of its

COMPLAINT

outfalls.

49.     The level of TOC in storm water detected by the Facility has exceeded the benchmark value for TOC of 110 mg/L established by EPA.  For example, on October 5, 2011, the level of TOC measured by Defendant at the "North 11806" outfall was 172 mg/L.  That level of TOC is over 1.5 times the benchmark value for TOC.  Sierra Aluminum also has measured levels of TOC in storm water discharged from the Facility in excess of 110 mg/L on October 6, 2010, and February 5, 2010.

50.     The levels of zinc in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.12 mg/L for zinc (CMC).  For example, on October 11, 2012, the level of zinc measured from one of the Facility's storm water outfalls was 8.44 mg/L.  That level of zinc is over 70 times the CMC for zinc.

51.     The level of zinc in storm water detected by the Facility has exceeded the benchmark value for zinc of 0.13 mg/L established by EPA.  For example, on October 11, 2012, the level of zinc measured by Defendants at one of the Facility's outfalls was 8.44 mg/L.  That level of zinc is almost 65 times the benchmark value for zinc.  The Facility also has measured levels of zinc in storm water discharged from the Facility in excess of 0.13 mg/L in nearly every other storm water sample it has taken for the past five years, including February 8, 2013; December 12, 2011; October 5, 2011; February 16, 2011; October 6, 2010; February 5, 2010; and October

14, 2009.

52.     The levels of copper in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.013 mg/L for copper (CMC) and the SSO established by the Basin Plan of 0.0182 mg/L for copper.  For example, on February 8, 2013, the level of copper measured from one of the Facility's storm water outfalls was 0.05 mg/L.  That level of copper is almost 4 times the CMC for copper, and almost 3 times the SSO for copper.

53.     The level of copper in storm water detected by the Facility has exceeded the benchmark value for copper of 0.0156 mg/L established by EPA.  For example, on February 8, 2013, the level of copper measured by Defendants at one of the Facility's outfalls was 0.05 mg/L.  That level of copper is over 3 times the benchmark value for copper.  The Facility also has measured levels of copper in storm water discharged from the Facility in excess of 0.0156 mg/L in nearly every other storm water sample it has taken for the past five years, including October 11, 2012; December 12, 2011; October 5, 2011; February 16, 2011; October 6, 2010; February 5, 2010; and October 14, 2009.

54.     The level of aluminum in storm water detected by the Facility has exceeded the benchmark value for aluminum of 0.75 mg/L established by EPA.  For example, on October 11, 2012, the level of aluminum measured by Defendants at one of the Facility's outfalls was 38.6 mg/L.  That level of aluminum is over 51 times the

COMPLAINT

benchmark value for aluminum.  The Facility also has measured levels of aluminum in storm water discharged from the Facility in excess of 0.75 mg/L in nearly every other storm water sample it has taken for the past five years, including February 8, 2013; December 12, 2011; October 5, 2011; February 16, 2011; October 6, 2010; February 5, 2010; and October 14, 2009.

55.     On information and belief, Plaintiff alleges that Defendant failed to conduct monthly visual observations of its storm water discharges during March 2013 and December 2009.

56.     On information and belief, Plaintiff alleges that Defendant failed to monitor discharges from two storm events at the "North East 11880" and "South East 11880" outfalls during the 2010-2011 wet season.

57.     On information and belief, Plaintiff alleges that Defendant has failed to sample and analyze storm water discharges since June 11, 2009, from one of its drains at the 11880 Pacific Avenue portion of the Facility.

58.     On information and belief, Plaintiff alleges that since at least August 11, 2009, Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, TSS, O&G, TOC, zinc, aluminum, copper, and other un-monitored pollutants.  Section B(3) of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has

failed to implement BAT and BCT.

59.     On information and belief, Plaintiff alleges that since at least August 11, 2009, Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an adequate assessment of potential pollutant sources, structural pollutant control measures employed by the Defendant, a list of actual and potential areas of pollutant contact, or an adequate description of best management practices to be implemented at the Facility to reduce pollutant discharges.  According to information available to CCAEJ, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit.

60.     Information available to CCAEJ indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility directly to San Bernardino County's municipal storm sewer system, which discharges into the San Sevaine Creek, which flows into the Santa Ana

River.

61.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

62.     Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least June 22, 2010.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

63.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

///

///

COMPLAINT

## VI.   <u>CLAIMS FOR RELIEF</u>

**<u>FIRST CAUSE OF ACTION</u>**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

64.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

65.    The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, TSS, O&G, TOC, zinc, aluminum, copper, and other un-monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

66.    Each day since August 11, 2009, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

67.    Defendant has been in violation of the BAT/BCT requirements every day since August 11, 2009.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

///

**SECOND CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

68.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

69.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

70.     Plaintiff is informed and believes, and thereupon alleges, that since at least October 14, 2009, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards in violation of the Discharge Prohibition A(2) of the General Permit.

71.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with sediment, floating materials, copper, zinc and other un-monitored pollutants at levels above or, in the case of pH, outside of applicable water quality

COMPLAINT

28

standards.  The storm water then flows untreated from the Facility into San Bernardino County's municipal storm sewer system, which discharges into the San Sevaine Creek, which flows into the Santa Ana River.

72.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

73.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

74.     Every day since at least October 14, 2009, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**THIRD CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

75.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

76.     Section A and Provision E of the General Permit requires dischargers of

COMPLAINT

storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

77.    Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor production of various materials without appropriate best management practices; the continued exposure of significant quantities of various materials to storm water flows; the continued exposure and tracking of waste resulting from the operation of vehicles at the site; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and water quality standards.

78.    Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

79.    Each day since August 11, 2009, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

80.    Defendant has been in violation of the SWPPP requirements every day since August 11, 2009.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

COMPLAINT

30

## FOURTH CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

81.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

82.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

83.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to analyze its storm water discharges from one of the outfalls at the 11880 Pacific Avenue portion of the Facility.

84.     Each day since August 11, 2009, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

///

///

COMPLAINT

**FIFTH CAUSE OF ACTION**
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

85.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

86.     Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least June 22, 2010.

87.     Each day since at least June 22, 2010, that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains its false certification of its compliance with the General Permit.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the Permit;

c.  Enjoin Defendant from further violating the substantive and procedural

COMPLAINT

requirements of the Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.  Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.  Order Defendant to pay civil penalties of $37,500 per day per violation for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

COMPLAINT

§ 1365(d); and,

k.  Award any such other and further relief as this Court may deem

appropriate.

Dated: August 11, 2014          Respectfully submitted,

                                LOZEAU DRURY LLP

                         By:    _/s/ Douglas J. Chermak_____
                                Douglas J. Chermak
                                Attorneys for Plaintiff
                                CENTER FOR COMMUNITY ACTION AND
                                ENVIRONMENTAL JUSTICE

COMPLAINT

34